**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| LIONEL S. DORSEY, *et al.* | |
| Plaintiffs, | |
| v. | Case No.: 8:18-cv-00829-PJM |
| MICHAEL SOKOLOFF, *et al.* | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANT MICHAEL SOKOLOFF'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND ........................................................................................ 2

I.      Deputy Sokoloff does not believe a taser can interfere with heart functioning ......... 3

II.     Deputy Sokoloff believes that an individual being tased engages in voluntary movement, which would appear in his view to justify repeatedly tasering a person ... ........................................................................................................................ 4

III.    The Decedent experienced a grand mal seizure at work approximately three months before he was tasered by Deputy Sokoloff ................................................ 5

IV.     The Decedent suffered a grand mal seizure on March 1, 2015 ................................ 5

V.      By the time Sokoloff arrived at the scene, he was aware that the firearm recovered from the Decedent's vehicle was secured by EMS personnel ................................... 7

VI.     Deputy Sokoloff tasered the Decedent multiple times before the Decedent stopped breathing ....................................................................................................... 7

VII.    Deputy Sokoloff's tasering of the Decedent violates standard police practices ......... 9

VIII.   Deputy Sokoloff's tasering of the Decedent was a proximate cause of his cardiac arrest on March 1, 2015 and his subsequent death ................................................... 9

IX.   There is no factual basis or credible expert testimony to conclude that the Decedent's behavior was drug induced ...................................................................... 10

X.   DeOntre Dorsey died on November 29, 2015 as a result of injuries sustained on March 1, 2015 ......................................................................................... 10

STANDARD OF REVIEW ..................................................................................... 11

ARGUMENT ......................................................................................................... 12

I.   Pursuant to FRCP 56(d), the Court should deny Defendant Sokoloff's motion for summary judgment because Plaintiffs' have not had an opportunity to take any discovery ................................................................................................... 12

   A. Plaintiffs' counsel's declaration under FRCP 56(d) supports denying the motion for summary judgment at this time ..................................................... 13

   B. Denying defendant's motion for summary judgment under FRCP 56(d) is warranted.................................................................................................. 14

II.   Even if this Court were to deny Plaintiffs' request for time to conduct discovery under FRCP 56(d), the motion for summary judgment should be denied because Sokoloff is not entitled to qualified immunity.................................................................. 15

   A. A determination as to whether Sokoloff is entitled to qualified immunity should not be decided before discovery. ....................................................... 15

   B. Deputy Sokoloff is not entitled to qualified immunity ...................................... 16

      1. Sokoloff violated the Decedent's constitutional rights in tasering him while he was undergoing a medical emergency ........................................... 17

      2. Using a taser was unreasonable because the Decedent was experiencing a medical emergency, he did not present any risk to Sokoloff or anyone else, and 911 was called to respond to a man suffering from a seizure ................ 19

      3. The Decedent did not pose an immediate threat to the safety of the officers or anyone at the scene ....................................................................... 20

4.   The Decedent was not actively resisting arrest or attempting to flee ........... 21

5.   At the time Sokoloff tasered Decedent, there was a clearly established right that individuals experiencing a medical emergency and not posing a danger should not be tasered .................................................................................... 24

III.   Sokoloff violated the Decedent's constitutional right to medical care .................... 30

IV.   The Court should deny Defendant Sokoloff's request to enter summary judgment on the Plaintiff's state law claims under Article 24 and 26 of the Maryland Declaration of Rights ................................................................................................................. 33

V.   Viewed in the light most favorable to the Plaintiff, there are sufficient facts that a reasonable jury could conclude that Sokoloff acted with gross negligence and/or malice .................................................................................................................. 34

CONCLUSION ................................................................................................................. 35

HEARING REQUEST ...................................................................................................... 35

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
(Southern Division)

LIONEL S. DORSEY, *et al.*

               Plaintiffs,

v.

MICHAEL SOKOLOFF, *et al.*

               Defendants.

Case No.: 8:18-cv-00829-PJM

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANT MICHAEL SOKOLOFF'S
MOTION FOR SUMMARY JUDGMENT**

Only 34 days after this Court denied Defendant Sokoloff's motion to dismiss under

FRCP 12(b)(6), (ECF 75), both on the merits and on qualified immunity grounds, Defendant

Sokoloff now files a motion for summary judgment on a record largely in the control of the

Defendants. In most civil rights cases not involving death, Plaintiffs could rely on the firsthand

observations of the victim to oppose a summary judgment motion before discovery commences.

DeOntre Dorsey is dead, however, so even that option is unavailable to Plaintiffs.

Sokoloff now seeks to deprive Plaintiffs of the opportunity to obtain discovery, including

from other witnesses to the killing.[1] The Fourth Circuit has commented that "[s]ummary

judgment before discovery forces the non-moving party into a fencing match without a sword or

mask." *McCray v. Md. DOT*, 741 F.3d 480, 483 (4th Cir. 2014). Given this is a wrongful death

case involving complicated factual questions where the witnesses to Sokoloff's interactions with

the Decedent are largely in the control of the Defendants (*i.e.*, County EMS workers, firefighters,

---

[1] There is one exception in that, before this case was removed, Plaintiffs were able to issue and received a response to a records subpoena from the Office of the Chief Medical Examiner. No other discovery has been conducted to date.

or employees with the Charles County Sheriff's Office), Plaintiffs request that this motion for summary judgment be denied because Plaintiffs should be entitled to a fair opportunity for discovery in this case.

FACTUAL BACKGROUND

Because Plaintiffs have not had the opportunity to take discovery, Plaintiffs are forced to rely on facts provided by Defendants and largely exclusively in the control of Defendants.[2] Regardless, even at this stage and without the benefit of discovery, it is clear that (1) Sokoloff's conduct is not protected by qualified immunity and (2) summary judgment should be denied.

First, Dr. Mark Haigney, a Professor of Medicine and Pharmacology at the Uniformed Services University of Health Sciences who is board certified in cardiovascular medicine and clinical cardiac electrophysiology,[3] opined that Sokoloff's use of the taser was a proximate cause of the Decedent's cardiac arrest:

- "[O]n March 1, 2015, Mr. Dorsey suffered a grand mal seizure immediately prior to being tasered by Deputy Sokoloff."

(Ex. 1, Haigney, M.D., Decl., at ¶ 11).

- "[T]he use of a taser on DeOntre Dorsey was a proximate cause of the cardiac arrest that occurred on March 1, 2015. This cardiac arrest resulted in substantial anoxic brain injury and his eventual death."

(Ex. 1, Haigney, M.D., Decl., at ¶ 6).

- "Mr. Dorsey's behavior described by law enforcement and in the medical records is inconsistent with opioid induced behavior or an opioid induced overdose."

(Ex. 1, Haigney, M.D. Decl, at ¶ 10).

---

[2] Plaintiffs have had access to documents produced by the Charles County Sheriff's Office under the Public Information Act.

[3] Dr. Haigney's *curriculum vitae* is attached as Exhibit 1 to his Declaration. (Ex. 1, Haigney, M.D. Decl., at Ex. 1).

2

Second, police practices and use of force expert Joseph J. Stine[4] opined that Deputy Sokoloff's conduct was not objectively reasonable:

- "It is a violation of standard police practices, policy, and training to taser an individual suffering from a seizure."

(Ex. 2, Stine Decl., at ¶ 9).

- "Deputy Sokoloff's use of force on DeOntre Dorsey where Deputy Sokoloff tasered him multiple times on March 1, 2015 was not objectively reasonable and not consistent with standard police practices, polices and training."

(Ex. 2, Stine Decl., at ¶ 10).

As explained below, this Court should deny Defendant Sokoloff's motion for summary judgment in its entirety.

## I.    Deputy Sokoloff does not believe a taser can interfere with heart functioning.

Prior to March 1, 2015, a jury found that Sokoloff used excessive force in violation of the Maryland Declaration of Rights in deploying his taser. Specifically, on August 23, 2013, a jury in *George Montrell Brooks vs Michael Sokoloff, et al*., Case No.: 08-C-11-002456 (Circuit Court for Charles County) entered a verdict against Sokoloff for violating a citizen's constitutional rights as the result of use of a taser. *See* (Ex. 3, Docket Entries in *Brooks v. Sokoloff*). Prior to that trial, Sokoloff testified under oath that "[t]he Taser does not cause death":

Q. Are you trained that the Taser can cause death?

A. No. The Taser does not cause death.

Q. Does not cause death?

A. No, sir.

Q. Okay. Are you trained that the Taser can possibly interfere with a person's -- the functioning of the heart?

---

[4] Stine's *curriculum vitae* is attached as Exhibit 2 to his Declaration. (Ex. 2, Stine Decl., at Ex. 2).

3

A. No, sir, because the Taser does not interfere with the functioning of the heart.

(Ex. 4, Sokoloff Depo. dated 7/13/12, at 107-08).

**II.     Deputy Sokoloff believes that an individual being tased engages in voluntary movement, which would appear in his view to justify repeatedly tasering a person.**

Beyond his belief that a taser cannot cause death, he also testified in this earlier case that an individual who is being tased continues to engage in "voluntary conduct," which would appear in his view to justify repeatedly tasering a person:

Q. What kind of voltage is discharged when you use the Taser? Do you know the voltage and all that?

A. It can be up to 50,000. However, it's a shaped charge.

\* \* \*

Q. I know, right, via the probes, but I mean you have some effort made to put your hands on him to handcuff him?

A. No. He's rolling around. I'm not attempting to get involved with him rolling around on the ground. I'm going to wait until he's done rolling.

Q. You're going to wait until he's done rolling?

A. Yes, sir.

Q. **Now, these movements are involuntary movements; right?**

A. **No, sir, not in this case.**

Q. **What do you mean not in this case? I'm talking about the writhing on the ground.**

A. **That was voluntarily.**

Q. **That's voluntary?**

A. Yes, sir. **That was voluntary because he's in pain**. In this case because the spread of the probes is so small, there's very minimal electromuscular disruption. If there were a wider spread of those probes, had I fired it from fifteen feet away and the spread would have been three or four feet, then I would say that his

4

actions were involuntary based on the muscular contraction, the electromuscular disruption from the electricity. However, in this case the probes are approximately five inches away, four or five inches away from each other. All he's getting for an electromuscular disruption is an area of about maybe the size of a dinner plate probably tops in his back. Now, is he in pain? Absolutely. He's in pain, but essentially at that point it's a pain compliance tool, not an electromuscular disruption tool.

(Ex. 4, Sokoloff Depo. dated 7/13/12, at 94-98).

### III.    The Decedent experienced a grand mal seizure at work approximately three months before he was tasered by Deputy Sokoloff.

On January 8, 2015, DeOntre Dorsey suffered a grand mal seizure on his way from work.

He was admitted to Northwest Hospital following a grand mal seizure, which lasted 3-5 minutes:

Presents with seizure. The onset was just prior to arrival. The occurrence was single episode. Witnessed: yes by coworkers. The location where the incident occurred was in car. The character of symptoms is generalized. The Postictal symptoms is uncooperative. Exacerbating factors consist of none. Risk factors consist of none. Therapy today: see nurses notes. Associated symptoms: none. Associated injury: bit tongue. 31 y/o male with no significant PMHx presents after generalized seizure PTA. **As per EMS, pt was a passenger in coworker's car on their way home from work when he started convulsing which lasted about 3-5 minutes**. EMS reports pt bit his tongue during event. EMS reports they talked to pt's father on phone who states Pt has no Hx of seizures. As per EMS glucose level was 124. History limitation due to postictal Sx, history obtained through EMS.

(Ex. 5, Medical Record from NW Hospital dated 1/8/15, at 19) (emphasis added). The toxicology screen following this grand mal seizure tested negative for all drugs. (Ex. 5, Medical Record from NW Hospital dated 1/8/15, at 20-21). The Decedent's subsequent autopsy noted that, "[p]rior to the initial incident, Mr. Dorsey had been diagnosed with new onset seizures after experiencing a witnessed grand mal seizure on 1/8/15 for which Neurology follow-up was recommended but not obtained." (ECF 88-18, Autopsy Report, at 7).

### IV.    The Decedent suffered a grand mal seizure on March 1, 2015.

5

On March 1, 2015, at approximately 4:30 p.m., the Decedent was driving on St. Charles Parkway in White Plains, Maryland in Charles County, when he lost control of his vehicle. A photograph taken by the Charles County Sherriff's Office shows how the Decedent's vehicle came to rest on a median:



(Photograph Produced by CCSO in Response to PIA Request).

A concerned citizen placed a 911 call. He reported, "I think a guy is having a seizure; he lost control of his vehicle." (ECF 88-5, Ex. 1 to Def.'s MSJ, Calls Received at the Charles County 911 Call Center, at 0:06-0:09). He explained that, "[i]t looks like he is having some type of seizures or something; he is jumping all over the place." (ECF 88-5, Ex. 1 to Def.'s MSJ, Calls Received at the Charles County 911 Call Center, at 0:45-0:51).  He added that he was "shaking and he is moving his arms and everything." (ECF 88-5, Ex. 1 to Def.'s MSJ, Calls Received at the Charles County 911 Call Center, at 2:42-2:46).

Emergency Medical Technicians Jurel Bowman and James Sires along with two students in training responded to the call for an individual having a seizure who was experiencing ineffective breathing. EMT Bowman entered the following into the medical record:

> AOS PT WAS IN A LOCKED VEHICLE **SEIZING SPINNING 360 DEGREES IN THE FRONT SEAT** I ATTEMPTED TO BREAK A WINDOW TO MAKE CONTACT WITH THE PATIENT. THE DOORS ENDED UP UNLOCKING AND HE ATTEMPTED TO CLOSE THE DOOR BACK. HE GOT OUT THE CAR STILL MOVING ON THE GROUND CCSO ARIVED HE BEGAN MOVING ON THEM WHILE THEY CUFFED HIM. THEY TAZED HIM X3 AND CUFFED AND SHACKLED HIM PA-38 HAD FULL PATIENT CARE THEY STARTED CHECKING HIM WHEN HE CODED AND WE STARTED CPR AND TRANSPORTED WITH PROVIDER FROM 609 ON BOARD.

(Ex. 6, Charles County Emergency Medical Services, Prehospital Care Report).

Dr. Mark Haigney, an expert retained by Plaintiffs, opined that the medical event experienced by the Decedent was a grand mal seizure. He declared as follows:

> Based on my review of these records, to a reasonable degree of medical probability in the field of medicine, the field of cardiology, and the field of cardiac electrophysiology, on March 1, 2015, *Mr. Dorsey suffered a grand mal seizure immediately prior to being tasered by Deputy Sokoloff*.

(Ex. 1, Haigney, M.D., Decl., at ¶ 11) (emphasis added).

**V.     By the time Sokoloff arrived at the scene, he was aware that the firearm recovered from the Decedent's vehicle was secured by EMS personnel.**

Before encountering the Decedent, Sokoloff had confirmation that a firearm observed in the Decedent's vehicle has been removed and secured in an ambulance. Sokoloff stated in his affidavit: "[J]ust as I arrived, I heard the CCSO dispatcher advise that EMS personnel were not 'backing out,' as the loaded *gun had been secured*." (ECF 88-11, Ex. 7 to Def's MSJ, Sokoloff Aff., at ¶ 4). Sokoloff continued: "I walked towards the vehicle, and, approximately halfway from my patrol car to where the vehicle involved in the accident was, I was met by a female EMS employee. I asked her where the gun was, and she told me that *it had been secured in an ambulance*." (ECF 88-11, Ex. 7 to Def's MSJ, Sokoloff Aff., at ¶ 5) (emphasis added).

**VI.    Deputy Sokoloff tasered the Decedent multiple times before the Decedent stopped breathing.**

Sokoloff tasered the Decedent multiple times before the Decedent suffered cardiac arrest. According to Sokoloff, "[t]he X2 CEW . . . was activated 2 times via the trigger switch and 5 times via the arc switch on March 1, 2015." (ECF 88-13, Revised Report of Bryan Chiles, at 28). Without the ability yet to depose him, Sokoloff described the encounter, in part, as follows:

> 9. With my repeated commands not complied with, I unholstered my Model X2 Taser Electronic Control Device ("Taser") and warned the man that, if he didn't comply, he would be tased. I repeated my commands and warning, holding my Taser at the ready for five or six seconds.  The man still didn't comply and moved closer to where I was standing. I moved around the man's left side and deployed my Taser in probe mode at an aiming point in the small of the man's back. I was approximately four feet from, and just slightly behind, the man's left hip.

> 10. The two prongs from the cartridge in bay one of the Taser discharged and contacted the man's back, one in the small of his back and the other more towards the middle of his back. The Taser discharged electric current for the standard five second duration. I immediately called out my Taser deployment over the radio as the man went to the ground onto his stomach from his hands and knees. He did not, however, stay on his stomach, even as I ordered him to do so. Instead of complying, the man began rolling on the ground, first away from me and then towards me. As he rolled, he became entangled in the ECD wires. He rolled onto his back making growling, gutteral sounds and incoherent noises. The man paused at one point and seemed to be staring right through me. Based on my training, knowledge and experience, I believed that I was witnessing drug-induced behavior, not related to any underlying medical condition.

> 11. I continued to issue verbal commands for the man to get on his stomach and put his hands behind his back. I warned the man that he would be tased again if he didn't comply. He didn't comply. I intended to deliver a short shock through the connected prongs in ARC mode, but instead discharged the second cartridge. Since I hadn't aimed, one prong made no contact with the man and the second made contact with his back. As a result, the five second activation did not deliver a shock, and the man continued to roll around on the ground.

> 12. I then switched to the ARC button but continued to issue verbal commands before pressing it. Again, my intention was to deliver a short shock of approximately one second, preceded and followed by verbal commands. If the man complied, then no further use of the Taser would be necessary. If not, I would to [sic] deliver another short shock in ARC mode. I deployed my Taser in ARC mode three or four times, delivering very short shocks, most of which were about a second. Each activation in ARC mode was preceded and followed by verbal commands, which were not complied with. The shocks were delivered over

a period of less than a minute. After the series of short shocks, I did not use the Taser again as it was not having any effect.

(ECF 88-11, Sokoloff Aff., at ¶¶ 7-12).

### VII.    Deputy Sokoloff's tasering of the Decedent violates standard police practices.

Police practices and use of force expert Joseph J. Stine opined, "Deputy Sokoloff's use of force on DeOntre Dorsey where Deputy Sokoloff tasered him multiple times on March 1, 2015 was not objectively reasonable and not consistent with standard police practices, policies, and training":

> 9. Based on my review of the records and my professional background, training and experience, to a reasonable degree of probability in the field of use of force and law enforcement practices and procedures, Deputy Sokoloff violated standard police practices, policies, and training when he treated DeOntre Dorsey's seizure as a law enforcement event instead of a medical event. It is a violation of standard police practices, policy, and training to taser an individual suffering from a seizure.

> 10. Based on my review of the records and my professional background, training and experience, to a reasonable degree of probability in the field of use of force and law enforcement practices and procedures, *Deputy Sokoloff's use of force on DeOntre Dorsey where Deputy Sokoloff tasered him multiple times on March 1, 2015 was not objectively reasonable and not consistent with standard police practices, policies, and training*.

(Ex. 2, Stine Decl., at ¶¶ 9-10).

### VIII.    Deputy Sokoloff's tasering of the Decedent was a proximate cause of his cardiac arrest on March 1, 2015 and his subsequent death.

Deputy Sokoloff's tasering of the Decedent on March 1, 2015 was a proximate cause of his death. Dr. Haigney declared as follows:

> Based on my review of these records, to a reasonable degree of medical probability in the field of medicine, the field of cardiology, and the field of cardiac electrophysiology, the use of a taser on DeOntre Dorsey was a proximate cause of the cardiac arrest that occurred on March 1, 2015. This cardiac arrest resulted in substantial anoxic brain injury and his eventual death.

(Ex. 1, Mark Haigney, M.D. Decl, at ¶ 6)

**IX.     There is no factual basis or credible expert testimony to conclude that the Decedent's behavior was drug induced.**

Between approximately 4:45 p.m. to 4:48 p.m., Sokoloff tasered Dorsey multiple times. (ECF 88-13, at 14). Less than one hour later, Mr. Dorsey was given a toxicology screen at approximately 5:35 p.m., at the University of Maryland Charles Regional Hospital, which tested positive for opiates and negative for other drugs. (ECF 88-16, Results for Toxicology Screen at 5:35 p.m. on March 1, 2015). Approximately four and half hours later, at 9:55 p.m., Mr. Dorsey was subjected to a second toxicology screen. (Ex. 7, Results from Toxicology Screen at 9:55 p.m. on March 1, 2015). This toxicology screen tested negative for opiates. (*Id.*).

Dr. Haigney opined that the initial positive test did not result from the use of opiates on March 1, 2015:

> 9. Based on my review of these records and my professional background, training and experience, to a reasonable degree of medical probability in the field of medicine, *the positive test at 17:35 or 5:35 p.m. did not result from the use of opiates on March 1, 2015 due to the amount of time that it takes the body to process and eliminate this drug*.
>
> 10. Based on my review of these records and my professional background, training and experience, to a reasonable degree of medical probability in the field of medicine, *Mr. Dorsey's behavior described by law enforcement and in the medical records is inconsistent with opioid induced behavior or an opioid induced overdose*.

(Ex. 1, Mark Haigney, M.D. Decl, at ¶¶ 7-10) (emphasis added).

**X.     DeOntre Dorsey died on November 29, 2015 as a result of injuries sustained on March 1, 2015.**

Mr. Dorsey remained hospitalized with an anoxic brain injury at several medical facilities between March 1, 2015 until his death on November 29, 2015. The autopsy report described the Decedent's status during this time period as follows:

> "During his hospital course over the next month, he was diagnosed with anoxic brain injury, sympathetic storm, seizures, acute kidney injury/rhabdomyolysis,

ischemic transaminitis requiring percutaneous endoscopic gastrostomy and chronic respiratory failure requiring tracheostomy on 3/13/15, and Pseudomonas hospital-acquired pneumonia. He was subsequently transferred to a Washington DC nursing facility on 3/31/15 for chronic medical management. ***He remained in a vegetative state.*** His course there was complicated by sepsis and the development of stage II-IV decubitus ulcers requiring inpatient hospital medical treatment (intravenous antibiotics and wound care). He was ultimately transferred to the Gladys Spellman Nursing Facility on 8/5/15 for ventilator weaning, where he remained until his death on 11/29/15."

(ECF 88-18, Autopsy Report, at 7) (emphasis added).

## STANDARD OF REVIEW

"In general, summary judgment should only be granted 'after adequate time for discovery.'" *McCray v. Md. DOT*, 741 F.3d 480, 483 (4th Cir. 2014). Summary judgment must "be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). "Generally speaking, 'sufficient time for discovery is considered especially important when the relevant facts are exclusively in the control of the opposing party.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 246-47 (4th Cir. 2002).

"[S]ummary judgment prior to discovery can be particularly inappropriate when a case involves complex factual questions about intent and motive." *Id.* at 247.  This is especially true, like here, in cases involving civil rights and constitutional claims. *See Tarleton v. Meharry Med. Coll.*, 717 F.2d 1523, 1535 (6th Cir. 1983) ("[S]ummary judgment should not ordinarily be granted before discovery has been completed" and "[t]his principle is particularly strong when constitutional and civil rights claims are at issue.").[5]

---

[5] Defendant cites *Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995) for the proposition that it is appropriate to deny discovery. Sokoloff omits that *Strag* was not a case, like here, where the defendants sought to prevent any discovery. Rather, *Strag* was a case where the Court denied a request for additional discovery after what it characterized as "extensive discovery." *Id.* at 947. For this reason, *Strag* supports denying Sokoloff's motion for summary judgment.

11

Under FRCP 56(a), a party may move for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court views "the facts in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Garofolo v. Donald B. Heslep Assocs.*, 405 F.3d 194, 198 (4th Cir. 2005). "Summary judgment is proper when the moving party demonstrates, through 'particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials,' that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 536 (D. Md. 2013). Moreover, "under Fed.R.Civ.P. 56, as amended in 2010, facts in support of or opposition to a motion for summary judgment need not be in admissible form; the requirement is that the party identify facts that could be put in admissible form." *Id.* at 546.

## ARGUMENT

**I.    Pursuant to FRCP 56(d), the Court should deny Sokoloff's motion for summary judgment because Plaintiffs' have not had an opportunity to take any discovery.**

Under FRCP 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Motions made pursuant to FRCP 56(d) "are broadly favored and should be liberally granted in order to protect non-moving parties from premature summary judgment motions." *McCray*, 741 F.3d at 484. *See also Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007) ("District courts usually grant properly filed Rule 56([d]) motions as a matter of course.").

12

### A. Plaintiffs' counsel's declaration under FRCP 56(d) supports denying the motion for summary judgment at this time.

Plaintiffs' counsel has submitted a declaration under FRCP 56(d) that identifies specified reasons that the motion for summary judgment should be denied at this time until Plaintiffs have had sufficient time to conduct meaningful discovery. Plaintiffs cited the following reasons:

3.     This Court has not yet issued a scheduling order so, with one exception, Plaintiffs have been unable to take any depositions, issue document subpoenas, or obtain responses to request for production of documents from Michael Sokoloff, the other defendants, or other third parties.

4.     DeOntre Dorsey is dead. Because Mr. Dorsey is dead and unable to provide his version of what happened, Plaintiffs need to discover information from individuals who were witnesses to the events, which includes the opportunity to depose individuals who were present at the scene. This includes the numerous individuals standing around when Sokoloff tasered Mr. Dorsey.

5.     Plaintiffs need the opportunity to depose Michael Sokoloff to determine the circumstances around his decision to use the taser, what information he knew about the Decedent's medical condition, and whether his assertions in his affidavit are in fact credible or not. This is especially true given the dash camera footage from his police vehicle, though very grainy, appears to show a number of people calmly standing around without any evident threat or fear of danger at the time when Michael Sokoloff tasered the Decedent.

6.     Additionally, Plaintiffs need the opportunity to depose Sokoloff about his prior taser incidents, to identify the training he did or did not receive, and whether Sokoloff's actions of tasering Mr. Dorsey several times complied with his training, the Charles County Sheriff's Office's Administrative and Operational Manual, and standard police practices and procedures.

7.     Plaintiffs need the opportunity to depose members of the first EMS crew that arrived to assist Mr. Dorsey to obtain their first hand observations of Mr. Dorsey's condition and Michael Sokoloff's actions. These individuals are Jurel Bowman, James Sires, Matthew Hoyle, and Kellie Markovich.

8.     Plaintiffs need the opportunity to depose members of the other EMS workers that arrived to assist Mr. Dorsey to obtain their first hand observations of Mr. Dorsey's condition and Michael Sokoloff's actions. These individuals include Matthew Holt, Robin Williams (who has provided Defendant Sokoloff's counsel with an affidavit), and Heidi Quinn (who has also provided Defendant Sokoloff's counsel with an affidavit).

9.      Plaintiffs need the opportunity to depose the other law enforcement officers who witnessed Michael Sokoloff's interactions with Mr. Dorsey, which includes, but is not limited to, Sgt. Burroughs and Police Officer Cox.

10.     Plaintiffs need the opportunity to take discovery to determine, to the extent possible, whether the positive drug test for opiates was a false positive or was a product of any treatment given to Mr. Dorsey following the police and EMS response. This is especially important given the positive test for opiates shortly after he was transported to the hospital and a subsequent test approximately four hours later that tested negative for opiates.

(Ex. 8, Maloney Declr., at ¶¶ 3-10).

### B. Denying Defendant's motion for summary judgment under FRCP 56(d) is warranted.

There are three principal reasons why the motion for summary judgment should be denied. First, Mr. Dorsey is dead. While in non-death cases, Plaintiffs could rely on the first hand observations of the victim, because Mr. Dorsey is dead at the hands of Sokoloff, Plaintiffs have been denied the opportunity to rely on Mr. Dorsey's own observations. The Fourth Circuit has held that courts should hesitate before denying requests for additional discovery "when the party opposing summary judgment is attempting to obtain necessary discovery of information possessed only by her opponent." *Ingle v. Yelton*, 439 F.3d 191, 196-97 (4th Cir. 2006).

Second, with one minor exception, Plaintiffs have <u>not</u> had an opportunity to take any discovery. The one exception is that Plaintiffs sent a document subpoena to the medical examiner's officer prior to the removal of this case. There has not been a scheduling order issued in this case, therefore the parties have not had the ability to commence discovery.[6] *See* D. Md.

---

[6] In this Court's July 17, 2018 Order (ECF 75), the Court ordered the parties to jointly submit a proposed scheduling order. Plaintiffs initially proposed dates for the scheduling order on July 23, 2018, but Counsel for Defendant Sokoloff indicated he would discuss the scheduling order the following week with Plaintiffs' lead counsel. (Ex. 9, Emails dated 7-23-18). Sokoloff's Counsel added that "additional attorneys will be entering on behalf of various Defendants" and "I need to coordinate with them as well." (Ex. 10, Email dated 7-24-18). On August 21, 2018, Plaintiffs sent a second proposed scheduling order. (Ex. 11, Email dated 8-21-18). Rather than agreeing to

14

L.R. 803.1 ("Subject to L.R. 803.2, discovery shall be conducted in accordance with L.R. 104 and shall not commence until the issuance of Scheduling Order.").

Third, the sworn testimony developed to date is from individuals in the control of the Defendants, and Plaintiffs have not yet had an opportunity to develop a full factual record. Specifically, Defendants relied on affidavits from Sokoloff (Exhibit 7), Paramedic Heidi Quinn (ECF 88-6), EMT Robin Williams (ECF 88-7), and Firefighter Mark Tyrell (ECF 88-8). Plaintiffs should be entitled to obtain additional discovery and depose these individuals to develop a full factual record. Plaintiffs should be entitled to depose the other individuals who were present at the scene, including Sgt. Burroughs, Officer Cox, and EMTs Jurel Bowman, James Sires, Matthew Hoyle, and Kellie Markovich. For these reasons, Plaintiffs request that this Court deny Defendant's Motion for Summary Judgment under FRCP 56(d).

## II.   Even if this Court were to deny Plaintiffs' request for time to conduct discovery under FRCP 56(d), the motion for summary judgment should be denied because Sokoloff is not entitled to qualified immunity.

### A.   A determination as to whether Sokoloff is entitled to qualified immunity should not be decided before discovery.

A defense of qualified immunity is premature where there are unresolved disputes of fact relevant to the qualified immunity analysis. *See Suero v. Watkins*, 2016 U.S. Dist. LEXIS 19176, *20 (E.D. Pa. Feb. 12, 2016); *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002). "[I]t is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Newland v. Reehorst*, 328 Fed. Appx. 788, 791 n.3 (3d Cir. 2009). *See De La Paz v. Coy*, 954 F.Supp.2d 532, 549 (W.D. Tex. 2013)

---

or proposing alternate dates for a scheduling order, Sokoloff's counsel proposed deferring the entry of a scheduling order until the pending Motion to Disqualify, Motion for Summary Judgment, and Sheriff Coffey's Motion to Dismiss were resolved. (Ex. 12, Email dated 8-22-18).

(holding that it was premature to grant summary judgment to defendants where the plaintiff had not yet had an opportunity to conduct discovery); *Doe v. Barger*, 193 F.Supp.2d 1112, 1118-19 (E.D. Ark. 2002) (holding that "resolution of the qualified immunity defense requires development of the facts in this case, and that plaintiff should be given the opportunity to conduct discovery in order to respond"); *Powell v. Bucci*, 2006 U.S. Dist. LEXIS 50072, *32 (N.D.N.Y. July 21, 2006) (holding that the defendant officer's motion for summary judgment was premature on the grounds of qualified immunity "[b]ecause the record is not sufficiently developed to determine whether or not a constitutional violation occurred," and therefore affording defendant the opportunity to move again for summary judgment after additional discovery is conducted).

In a circumstance such as this where a motion for summary judgment is filed prematurely before the parties have had an opportunity to engage in discovery, a court should deny the motion for summary judgment.

### B.  Deputy Sokoloff is not entitled to qualified immunity.

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Usiak v. Brown*, 2011 U.S. Dist. LEXIS 94308, at *5 (D. Md. Aug. 23, 2011). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the facts illustrate that the officer violated the plaintiff's constitutional right…, and (2) whether the right was clearly established at the time of the alleged event such that 'a reasonable officer would have understood that his conduct violated the asserted right." *Younger*, 2017 U.S. Dist. LEXIS 133767, at * 17. The defendant officer bears the burden of

16

persuasion as to the defense and must show that the plaintiff's right to be free from excessive force, under the facts of the case, were not clearly established at the time of the plaintiff's arrest. *See Boswell v. Bullock*, 2012 U.S. Dist. LEXIS 98904, *29 (E.D.N.C. July 17, 2012).

> **1. Sokoloff violated the Decedent's constitutional rights in tasering him while he was undergoing a medical emergency.**

While courts may look at the two qualified immunity steps in either order, the "better approach to resolving cases in which the defense of qualified immunity is raised" is to "determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016). *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (stating that courts, when confronted with a qualified immunity claim, must first ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"). As to the first prong, Sokoloff's tasing of the Decedent while he was having a seizure, and thus unable to respond to the demands, was excessive force in violation of the Decedent's constitutional rights.

"A claim that law enforcement used excessive force in the course of making an arrest, investigatory stop, or other seizure of [a] person is properly analyzed under the Fourth Amendment's objective reasonableness standard." *Yates v. Terry*, 817 F.3d 877, 886 (4th Cir. 2016) (internal quotations omitted). The reasonableness of any force employed should be viewed "in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003).

The Supreme Court established the totality of the circumstances test in *Graham v. Connor*, 490 U.S. 386 (1989), which is followed by the Fourth Circuit when assessing the reasonableness of an officer's use of force. *Armstrong*, 810 F.3d at 899. *Graham* requires courts look at "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Id.*

17

Courts examine three factors in determining if an officer's action was reasonable under the Fourth Amendment: (1) the severity of the crime; (2) the extent to which "the suspect poses an immediate threat to the safety of the officers or others"; and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts also consider "[t]he extent of plaintiff's injury." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). In considering the reasonableness, courts "must view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Armstrong*, 810 F.3d at 899.

Under clearly established law at the time the Decedent was tased, use of serious force, including a Taser, is disproportionate in violation of the Fourth Amendment when used against an unarmed, non-violent individual who had not committed a crime, who was not actively resisting arrest, who was undergoing a seizure, and did not pose any immediate or serious threat to the safety of the officer. In the present case, the first *Graham* factor weighs in favor of Plaintiffs because the reason that the Decedent came into contact with EMS had nothing to do with criminal conduct.

The second and third *Graham* factors weigh in Plaintiffs' favor. While suffering from a seizure, the Decedent was unable to comply with Sokoloff's commands. Despite his efforts to stand-up and comply, the Decedent was unable to. This did not give Sokoloff an objectively reasonable basis for concluding that the Decedent put his safety at risk. After Sokoloff first deployed the taser, the Decedent became wrapped in the Taser wires on the ground, was talking incoherently, and appeared to be "looking through" Sokoloff. The Decedent was not attempting to flee, he was not actively resisting, and he was not an immediate threat to anyone, yet Sokoloff deployed his taser again. Sokoloff's use of a Taser against the Decedent was objectively

unreasonable as Sokoloff used disproportionate and excessive force in responding to a citizen suffering a medical emergency. Therefore, summary judgment is inappropriate.

> **2. Using a taser was unreasonable because the Decedent was experiencing a medical emergency, he did not present any risk to Sokoloff or anyone else, and 911 was called to respond to a man suffering from a seizure.**

As to the first *Graham* factor, "[w]hen the subject of a seizure ha[s] not committed any crime, this factor weighs heavily in [the subject's] favor." *Armstrong*, 810 F.3d at 899 (quoting *Bailey v. Kennedy*, 394 F.3d 731, 743-44 (4th Cir. 2003)) (internal quotations omitted). *See Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) ("[T]he severity of the crime cannot be taken into account because there was no crime."). "Even in a case in which the plaintiff ha[s] committed a crime, when the offense [i]s a minor one, we have found that the first *Graham* factor weigh[s] in plaintiff's favor." *Jones v. Buchanan*, 326 F.3d 520, 528 (4th Cir. 2003).

In *Jones*, the Fourth Circuit noted that it had been confronted twice in recent years with circumstances in which the plaintiff, subjected to police force, had committed no crime. *Id.* at 528. In both cases, the court held that "plaintiff had stated a claim for violation of his constitutional right to be free from excessive police force." *Id.* (citing *Clem v. Corbeau*, 284 F.3d 543, 545-47 (4th Cir. 2002); *Park v. Shiflett*, 250 F.3d 843, 848, 853 (4th Cir. 2001)).

The Decedent had been driving his vehicle on St. Charles Parkway when he lost control of his vehicle, which came to rest on a median. A concerned citizen called 911 and reported, "I think a guy is having a seizure; he lost control of his vehicle." (ECF 88-5, Ex. 1 to Def.'s MSJ, Calls Received at the Charles County 911 Call Center). In response to the call for an individual having a seizure who was experiencing ineffective breathing, Emergency Medical Services arrived. (ECF 88-5, Ex. 1 to Def.'s MSJ, Calls Received at the Charles County 911 Call Center). As such, the reason that the Decedent came into contact with EMS had nothing to do with

criminal conduct. The firearm that was recovered from the vehicle was secured in an ambulance at the time Sokoloff arrived, and Sokoloff was aware that the firearm had been secured. (ECF 88-11, Sokoloff Aff., at ¶ 4). The first *Graham* factor therefore weighs in favor of the Decedent.

### 3. The Decedent did not pose an immediate threat to the safety of the officers or anyone at the scene.

The Decedent, who was suffering from a seizure at the time he was tased by Sokoloff, did not pose an immediate threat to Sokoloff or anyone at the scene. Courts consider whether a "reasonable officer" could have perceived that the Decedent "posed an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396.

The subject of a police seizure does not create an immediate safety risk "simply because he is doing something that can be characterized as resistance – even when the resistance includes physically preventing an officer's manipulations of his body." *Yates*, 817 F.3d at 886. Fourth Circuit "precedent, consequently, makes clear that tasers are proportional force <u>only</u> when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser." *Armstrong*, 810 F.3d at 903.  In *Yates*, the Fourth Circuit denied a motion for summary judgment, finding that the objective facts, viewed in the light most favorable to the plaintiff, showed that the plaintiff "was neither a dangerous felon, a flight risk, nor an immediate threat to Terry or anyone else," and the officer's use of the taser therefore violated the plaintiff's Fourth Amendment rights. *Yates*, 817 F.3d at 886.

This Court has refused to grant summary judgment in favor of officers who tased an arrestee when there was a dispute as to whether there was an immediate threat to the officer's safety.  *See, e.g.*, *Housley v. Holquist*, 879 F. Supp. 2d 472, 481-82 (D. Md. 2011); *Dent v. Montgomery County Police Dep't*, 745 F. Supp. 2d 648, 658 (D. Md. 2010).  Where the arrestee and officer have diverging accounts of the events leading up to the use of a Taser, summary

judgment is inappropriate if an arrestee demonstrates he or she made reasonable efforts to comply with police directives. *See Dent*, 745 F. Supp. 2d at 658, 661.

Here, viewed in the light most favorable to Plaintiffs, the second *Graham* factor weighs in Plaintiffs' favor. Decedent did not pose an immediate threat to the safety of anyone at the scene. The facts do not support the conclusion that the officers or medical personnel were in any immediate danger. Sokoloff contends that as he arrived at the scene, he heard "the CCSO dispatcher advise that EMS personnel were not 'backing out,' as the loaded gun had been secured." (ECF 88-11, Ex. 7 to Def's MSJ, Sokoloff Aff., at ¶ 4). Sokoloff was therefore aware that the firearm had been moved away from the Decedent and placed in the ambulance.

### 4. The Decedent was not actively resisting arrest or attempting to flee.

Use of serious force is not objectively reasonable to effectuate an arrest if, at the moment the force is deployed, the arrestee is not attempting to flee, not "actively resisting" arrest, or no longer poses a continuing threat to the officer's safety.  *See, e.g.*, *Henry v. Purnell*, 652 F.3d 524, 532 (4th Cir. 2011); *United States v. Hampton*, 628 F.3d 654 (4th Cir. 2010); *Orem v. Rephann*, 523 F.3d 442, 447–49 (4th Cir. 2008); *Rowland v. Perry*, 41 F.3d 167, 172-74 (4th Cir. 1994).

With respect to the third *Graham* factor, the Fourth Circuit in *Armstrong* explained:

> While the questions whether an arrestee has been restrained and is complying with police directives are, of course, relevant to any inquiry into the extent to which the arrestee "pose[s] a  continuing threat to the officers' safety," *Meyers*, 713 F.3d at 733, they are not dispositive. A rule limiting taser use to situations involving a proportional safety threat does not countenance use in situations where an unrestrained arrestee, though resistant, presents no serious safety threat.

810 F.3d at 903-04.

**"Even noncompliance with police directives and non-violent physical resistance do not necessarily create a continuing threat to the officers' safety."** *Armstrong*, 810 F.3d at 904 (internal quotations omitted) (emphasis added). In *Nelson v. City of Davis*, 685 F.3d 867, 882

(9th Cir. 2012), the Ninth Circuit held that an individual's failure to comply with an officer's orders does not rise to the level of active resistance:

> As our prior cases illustrate, active resistance is not to be found simply because of a failure to comply with the full extent of an officer's orders. To the contrary, where an individual's resistance was [not] particularly bellicose, we have held that various applications of force, including the use of pepper spray, and bean bag projectiles, were not reasonable. Therefore, even if Nelson heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance. There is therefore no justification for the use of force to be found in the third *Graham* factor.

(Internal citations and quotations omitted).

The Fourth Circuit has repeatedly recognized that "deploying a teaser is a serious use of force, that is designed to inflict a painful and frightening blow." *Yates*, 817 F.3d at 886 (internal quotations omitted). The Fourth Circuit has found that are "designed to cause…excruciating pain" and their "application can burn a subject's flesh." *Armstrong*, 810 F.3d at 902 (internal quotations omitted). "Taser use is severe and injurious regardless of the mode to which the taser is set." *Id.* at 911. *See Gacia v. Dutchess Cty.*, 43 F.Supp.3d 281, 297 (S.D.N.Y. 2014) ("[B]oth methods of deploying a taser constitute 'significant' force."). In *Armstrong*, where the officer used his taser in drive stun mode, the court determined that its "conclusion about the severity of taser use, however, would be the same had he used dart mode" because "[d]art mode, no less than drive stun mode, inflicts extreme pain." 810 F.3d at 902.

Other jurisdictions have similarly held that "taser use can constitute excessive force when used in response to non-violent resistance." *Id.* at 904. The *Armstrong* court reasoned that the officers' use of force was only "proportional[]…in light of all circumstances," if the plaintiff's "resistance raised a risk of immediate danger that outweighs the Graham factors militating against harming" him. *Id.* at 906. The court concluded:

> Under these facts, when Officer Gatling deployed his taser, Armstrong was a
> mentally ill man being seized for his own protection, was seated on the ground,
> was hugging a post to ensure his immobility, was surrounded by three police
> officers and two Hospital security guards, and had failed to submit to a lawful
> seizure for only 30 seconds. A reasonable officer would have perceived a static
> stalemate with few, if any, exigencies - - not an immediate danger so severe that
> the officer must beget the exact harm the seizure was intended to avoid.

*Id.* at 906.

In *Meyers v. Baltimore County*, 713 F.3d 723, 733-34 (4th Cir. 2013), the Fourth Circuit

held that an officer's first three taser deployments did not amount to unreasonable or excessive

force because the plaintiff "was acting erratically, was holding a baseball bat that he did not

relinquish until after he received the second shock, and was advancing toward the officers."

However, the Court held that the seven subsequent deployments amounted to excessive force:

> It is an excessive and unreasonable use of force for a police officer repeatedly to
> administer electrical shocks with a taser on an individual who no longer is armed,
> has been brought to the ground, has been restrained physically by several other
> officers, and no longer is actively resisting arrest.

*Id.* at 734. The distinction was that "tasing the arrestee ceased being proportional force when the

officer continued to use his taser after the arrestee did not pose a continuing threat to the officers'

safety." *Armstrong*, 810 F.3d at 903 (internal quotations omitted).

Here, there is no evidence that the Decedent attempted to flee or made any threats to flee.

To the contrary, it was evident that the Decedent, who was having trouble even standing, was not

in the process of running from the scene or driving away. *See* (ECF 88-11, Sokoloff Aff., at ¶ 8)

("The man moved onto his hands and knees and appeared to be trying to stand"). Police reports

indicate that, "Dorsey rolled away from Cpl. Sokoloff and then towards Cpl. Sokoloff becoming

wrapped in the taser wires. Dorsey was now on his back making noises, though incoherent.

Dorsey was staring through Cpl. Sokoloff." (ECF 88-9, Police Reports, at 50). Further, even if

the Decedent was not able to comply with Sokoloff's commands, this does not mean that he was

an immediate threat to anyone's safety. Mere noncompliance with police directives does "not necessarily create a continuing threat to the officers' safety." *Armstrong*, 810 F.3d at 904.

Viewed in the light most favorable to Plaintiffs, the third *Graham* factor weighs in Plaintiffs' favor. The Decedent's conduct leading up to Sokoloff's use of a Taser cannot be reasonably perceived as resisting arrest. It was objectively unreasonable for Sokoloff to presume that the Decedent was resisting arrest when he was having trouble standing up or when he was rolling in the taser wires and talking incoherently. The Decedent did not and could not comply with Sokoloff's orders, as he was physically incapable of doing so due to his ongoing seizure.

Moreover, police practices expert Stine has opined that "Deputy Sokoloff's use of force on DeOntre Dorsey where Deputy Sokoloff tasered him multiple times on March 1, 2015 was not objectively reasonable and not consistent with standard police practices, polices and training." (Ex. 2, Stine Decl., at ¶ 10). This is so because "[i]t is a violation of standard police practices, policy, and training to taser an individual suffering from a seizure." (*Id.* at ¶ 9).

> **5. At the time Sokoloff tasered Decedent, there was a clearly established right that individuals experiencing a medical emergency and not posing a danger should not be tasered.**

As to the second prong of qualified immunity, at the time Sokoloff repeatedly tasered the Decedent on March 1, 2015, there was a clearly established right that individuals undergoing a medical emergency and who are not actively resisting or posing a danger should not be tasered, and a reasonable officer would have understood that that his conduct violated this right.

A right is clearly established where it is "sufficiently clear that every reasonable official would have understood that what he was doing violates that right." *Yates*, 817 F.3d 877, 887 (4th Cir. 2016) (internal quotations omitted). "[A] right need not be recognized by a court in a specific context before such right may be held clearly established for purposes of qualified

immunity." *Id.* (internal quotations omitted). To determine if the right violated was clearly

established, courts "do not require a case directly on point…so long as existing precedent [has]

placed the statutory or constitutional question beyond debate." *Blevins v. Cabela's Wholesale*

*Inc.*, 2018 U.S. Dist. LEXIS 79960, *21 (W.D. Va. May 11, 2018). Further, to be clearly

established, the right does not need to be agreed upon by all judges. *Owens v. Balt. City State's*

*Attys. Office*, 767 F.3d 379, 399 (4th Cir. 2014). *"*Rather, [i]f the unlawfulness is apparent, the

fact that some court may have reached an incorrect result will not shield a defendant's violation

of a clearly established right." *Id.* Even in novel factual circumstances, "officials can still be on

notice that their conduct violates law." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "Although

earlier cases involving 'fundamentally similar' facts can provide especially strong support for a

conclusion that the law is clearly established, they are not necessary to such a finding." *Id.*

The Fourth Circuit had previously held that the use of a taser against a non-violent

individual who was not dangerous or actively resisting and was compliant was unlawful. As the

Fourth Circuit explained in *Yates v. Terry*, 817 F.3d 877, 886 (4th Cir. 2016),

> **In this case, it was clearly established in 2008 that a police officer was not**
> **entitled to use unnecessary, gratuitous, or disproportionate force by**
> **repeatedly tasing a nonviolent misdemeanant who presented no threat to the**
> **safety of the officer or the public and who was compliant and not actively**
> **resisting arrest or fleeing.** *See Meyers*, 713 F.3d at 734-35; *Jones* 325 F.3d at 532-
> 34; *Bailey v. Kennedy*, 349 F.3d 731, 745 (4th Cir. 2003); *Rowland*, 41 F.3d at
> 174; *see also Parker v. Gerrish*, 547 F.3d 1, 9-11 (1st Cir. 2008); *Casey*, 509 F.3d
> at 1282, 1284-86. Although our decisions in *Meyers*, *Bailey*, and *Jones* dealt with
> individuals who were secured when they were subjected to excessive force, our
> precedent nonetheless provided Terry with fair notice that the force he used against
> Yates under the facts of this case was unconstitutionally excessive.

*Yates*, 817 F.3d at 887 (emphasis added).

Sokoloff's contention is inaccurate that at the time Sokoloff tased the Decedent there

"was only a single case from the Fourth Circuit, *Meyers v. Baltimore County, Md.*, 713 F.3d 723

25

(4th Cir. 2013)," that concerned "the use of Tasers as a means to subdue." (ECF 88-3, Sokoloff Mem., at 23). *See, e.g., Orem v. Rephann*, 523 F.3d 442 (4th Cir. 2008).

In *Bailey* and *Jones*, both decided in 2003, the Fourth Circuit "denied qualified immunity to officers who used excessive force against individuals who had not committed any crimes, were secured in handcuffs, and posed no threat to the officers or others." *See Jones v. Buchanan*, 325 F.3d 520, 532-34 (2003); *Bailey*, 349 F.3d at 745. In *Rowland*, decided in 1994, the Fourth Circuit denied qualified immunity to an officer who "used a wrestling maneuver, throwing his weight against [the suspect's] right leg and wrenching the knee until it cracked," where the suspect committed a crime and there was some evidence of resistance. 41 F.3d at 172, 174. The court reasoned that the suspect was not armed or dangerous when he was tased. *Id.* at 174. Based on these Fourth Circuit cases, decided before March 1, 2015, a reasonable officer would have known that repeatedly tasing a nonviolent person, who was not a threat, was not actively resisting arrest, and could not physically respond to an officer's demands was unlawful.

Other circuits have recognized that using excessive force against an individual experiencing a medical emergency is unconstitutionally unreasonable. In *McClendon v. City of Sumiton*, 2015 U.S. Dist. LEXIS 63684 (N.D. Ala. May 15, 2015), the plaintiff alleged the officer hit, kicked, and used a stun gun on the plaintiff, who was having an epileptic seizure and offering no resistance, and that the officer therefore failed to respond reasonably under the circumstances. The court cited to other circuits to support its holding:

> **As courts within and outside this Circuit have consistently held, the use of violent force against a subject who is experiencing a medical event and who purportedly poses no threat to himself or others is unconstitutionally unreasonable.** *See, e.g. Mercado* [*v. City of Orlando*], 407 F.3d at 1158 [11th Cir. 2005] (officer acted unreasonably when he fired a sage gun at plaintiff, who was suicidal but otherwise not a threat to himself or police); *Aldaba v. Pickens*, 777 F.3d 1148, 1160-61 (10th Cir., 2015) (officers acted unreasonably when they used stun guns to subdue an agitated hospital patient who was not threatening

26

himself or others); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)
(officers acted unreasonably when shooting plaintiff, who "had lost control of
himself" and was "screaming and banging on the walls of his house," with a
beanbag gun.). Therefore, drawing all reasonable inference in Plaintiffs' favor, *see
Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010), the court finds that
Plaintiffs have alleged a plausible violation of the Constitution.

*Id.*, at *17-18 (emphasis added). *See also Oliver v. Fiorino*, 586 F.3d 898, 901, 906-07 (11th Cir.

2009) (holding that as of 2004, a mentally unstable individual who flagged down an officer to

falsely report a shooting had a clearly established right not to be tased where he was not

suspected of a crime, was largely compliant, and posed no immediate threat other than one

moment of struggle); *Asten v. City of Boulder*, 652 F.Supp.2d 1188, 1203 (D. Colo. 2009)

(holding that a mentally unstable woman had a clearly established right not to be tased in her

home without warning where she was not suspected of a crime, posed no threat, and only resisted

by refusing to let officers come into her home); *Bady v. Murphy-Kjos*, 2008 U.S. Dist. LEXIS

110212 (D. Minn. Aug. 7, 2008) (holding that defendants were not entitled to qualified immunity

where the officers jumped, kneed, and punched a non-resistant suspect who was experiencing a

medical emergency and then tased him four times when he was on the ground).

   In *Meyers*, the decedent was carrying a baseball bat when the officers arrived.

713 F.3d at 727. The officer at the scene concluded that the decedent "posed a threat to the

officers' safety because he was carrying a baseball bat." *Id.* The court found that the first three

taser deployments did not amount to unreasonable or excessive force because the decedent was

holding a bat that he did not relinquish until after receiving a second taser shock and that he was

advancing towards the officers. *Id.* at 733. The court determined that, "[u]nder these

circumstances, the decedent posed an immediate threat to the officers' safety, and was actively

resisting arrest." *Id.* However, the court held that the next seven taser shocks were excessive and

unreasonable because the justification for the initial force was eliminated, as the decedent had

27

relinquished the bat, he fell to the floor, and several officers stat on his back. *Id.* The court held that "[i]t is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest." *Id.* at 734. As *Meyers* was decided in 2013, this was a clearly established right at the time Sokoloff tased the Decedent on March 1, 2015.

Further, it was well-established at the time that Sokoloff deployed the taser against the Decedent that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Meyers*, 713 F.3d at 733; *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005). *See also Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) (holding that an officer's otherwise acceptable use of pepper spray becomes excess when the arrestee was "offering no further active resistance"); *Franklin v. Montgomery County*, 2006 U.S. Dist. LEXIS 68476,*41 (D. Md. Sept. 13, 2006) (denying summary judgment to officers given the outstanding factual dispute regarding the use of a Taser against an arrestee already brought to the ground who was attempting to comply with the officer's orders).

It was also clearly established at the time that Sokoloff tasered the Decedent that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Meyers*, 713 F.3d at 734 (quoting *Bailey v. Kennedy*, 349 F.3d 731, 744-45 (4th Cir. 2003)):

> The fact that the force used in the present case emanated from a taser, rather than from a more traditional device, is not dispositive. The use of any "unnecessary, gratuitous, and disproportionate force," whether arising from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured. *See Park*, 250 F.3d at 852-53 (concluding that an officer's use of "pepper spray" to subdue an unarmed subject was irresponsible and excessive when the subject was not a threat to the officer or the public, and that the officer was not entitled to qualified immunity); *see also Orem v.*

28

> *Rephann*, 523 F.3d 442, 449 (4th Cir. 2008) (concluding that use of a taser to
> "punish or intimidate" a pretrial detainee is not objectively reasonable and is
> contrary to clearly established law).

*Id.* at 734-35.

Sokoloff's own experience as a defendant provided him with the requisite understanding that tasering someone who is not actively resisting would be considered excessive force. He was the defendant in a civil lawsuit in 2011, arising out of his unlawful use of his taser against George Brooks. *See Brooks v. Sokoloff, et al.*, Case No. 08-C-11-002456 (Circuit Court for Charles County). A jury returned a verdict against Sokoloff, finding he used excessive force against Brooks in tasering him and that that use of force violated Brooks' constitutional rights.

Despite the fact that the tasing of the Decedent occurred in March 2015 before *Armstrong* was decided, it was clearly established law that the use of a Taser against him was excessive and disproportionate. *See Yates*, 817 F.3d at 887 (stating it was clearly established in 2008 that an officer could not repeatedly tase "a nonviolent misdemeanant who presented no threat to the safety of the officer or the public and who was compliant and not actively resisting arrest or fleeing"). The Decedent did not present to the officers in a threatening manner. Rather, he was physically unable to respond to Sokoloff's demands due to his ongoing seizure. He was not taking *active* steps, or even passive steps, to resist the police officers. Rather, the Decedent was unable to control his body while having a seizure. If the Decedent's conduct can be characterized as resistance at all, it was merely passively not complying with Sokoloff's commands, and the Decedent's conduct was non-threatening. Further, he made multiple efforts to stand up but was physically unable to do so. (ECF 88-11, Sokoloff Aff., at ¶ 8)

After Sokoloff tased the Decedent, the Decedent immediately fell to the ground and became wrapped in the taser wires. Sokoloff continued to give the Decedent commands while

the Decedent "was on his back making incoherent noises." (ECF 88-9, Police Reports, at 50).

Even though the Decedent was on the ground wrapped in the taser wires and unable to respond,

Sokoloff fired the second cartridge and delivered three or four shocks to the Decedent. Similar to

*Meyers*, Sokoloff cannot claim that the Decedent's conduct justified the use of a Taser against

him when he was already on the ground and was not posing an immediate safety risk to the

officers.  The additional taser uses were clearly unreasonable. Under *Meyers*, when an arrestee

has already been subdued and is no longer moving, it is unnecessary to use force against him in

order to effectuate an arrest. 713 F.3d at 735.

In sum, a reasonable officer at the time could have understood that tasing a person who

was undergoing a medical emergency and was not an immediate threat to the officer or others

was unconstitutional.

**III.     Sokoloff violated the Decedent's constitutional right to medical care.**

A 42 U.S.C. § 1983 claim "is the proper vehicle through which to pursue claims for

excessive use of force during an arrest and deprivation of medical care." *Estate of Anderson v.

Strohman*, 2016 U.S. Dist. LEXIS 97800, *14-15 (D. Md. July 27, 2016) (citing *Martin v.

Gentile*, 849 F.2d 863, 865 (4th Cir. 1988)). A § 1983 claim for deprivation of medical care is

properly asserted under the Due Process Clause of the Fourteenth Amendment and a court must

examine whether there was "deliberate indifference to serious medical needs." *See Martin*, 849

F.2d at 871. This standard is different than the one applied in examining excessive use of force:

> The Court examines § 1983 claims for excessive use of force under a completely
> different standard than § 1983 claims for deprivation of medical
> care. See *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d
> 443 (1989) (explaining that § 1983 claims for excessive use of force during an
> arrest are properly asserted under the Fourth Amendment and require a court to
> examine whether an officer's conduct was "objectively reasonable" under the
> circumstances); *Martin*, 849 F.2d at 871 (explaining that § 1983 claims for
> deprivation of medical care are properly asserted under the Due Process Clause of

the Fourteenth Amendment and require a Court to examine whether there was a
"deliberate indifference to serious medical needs").

*Estate of Anderson*, 2016 U.S. Dist. LEXIS at *14-15.

A plaintiff can show an officer was acting with deliberate indifference "by the denial,
delay or intentional interference with medical treatment or by the way in which medical care is
provided." *Nelson v. Butte Cnty. Sheriff's Dep't*, 2012 U.S. Dist. LEXIS 32028, *39 (E.D. Cal.
Mar. 9, 2012). An officer will be liable if he knew the plaintiff faced "a substantial risk of
serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* "A
mere delay or interference with treatment can be sufficient to constitute a violation of the Eighth
Amendment."[7] *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009). "In such cases, in addition to
establishing that his medical need was objectively serious, a plaintiff also must show that he
delay in providing medical care caused him to suffer 'substantial harm.'" *Id.*

While Plaintiffs have not yet had the opportunity to depose Sokoloff, Sokoloff indicates
that he responded to a call for an individual who was "laying on the ground outside of the
driver's side of the car" and "[t]he man's legs were up in the air, kicking wildly, and striking the
rear door on the driver's side." (ECF 88-11, Sokoloff Aff., at 2-3).  Sokoloff also observed him
"flailing his arms" and Sokoloff asked EMS personnel "what the problem with the driver was,"
suggesting he knew there was a potential medical problem. (ECF 88-11, Sokoloff Aff., at 2-3).

What is more, police practices expert Stine opines that "[i]t is a violation of standard
police practices, policy, and training to taser an individual suffering from a seizure." (Ex. 2, Stine

---

[7] "While a pre-trial detainee's rights with respect to claims of deliberate indifference to serious
medical needs are prohibited by the due process clause of the Fourteenth Amendment, rather
than the Eighth Amendment, with respect to such claim, a pretrial detainee's due process rights
are co-extensive with a convicted prisoner's Eighth Amendment rights." *Turner v. King*, 121
Fed. Appx. 9, 13 (4th Cir. Jan. 7, 2005).

Declr., at ¶ 9). Not only is it a violation of standard police practices to taser an individual suffering from a seizure, to the extent that the Defendant's claim as they seem to do that Dorsey's death was the result of "Excited Delirium," the Charles County Sheriff's own Office Administrative Operational Manual indicates that if an officer "reasonably believes an individual may be experiencing excited delirium, the individual is to be treated as if he is in a medical crisis and will require medical attention":

> Law enforcement officers must be aware of behavior signs that are consistent with excited delirium, but it is not incumbent on them to differentiate true excited delirium from other behaviors that mimic it. ***When an officer reasonably believes an individual may be experiencing excited delirium, the individual is to be treated as if he is in a medical crisis and will require medical attention. The individual must receive medical attention regardless of whether the subject is also suspected of being under the influence of drugs and/or alcohol.***

(Ex. 13, CCSO Administrative and Operational Manual, § 3-805.1 Recognizing Excited Delirium) (emphasis added).

While Plaintiffs have not yet had the opportunity to depose Sokoloff, his own affidavit appears to indicate that he understood the Decedent was in medical distress and his observations are plainly consistent with the Decedent suffering a seizure. Moreover, viewed in the light most favorable to the Plaintiffs, Sokoloff clearly had subjective knowledge of the risk of serious harm to the Decedent, disregarded the risk, and brutally tasered the Decedent. The factual record developed to date reflects that Sokoloff realized the Decedent was having a seizure or other medical emergency and proceeded to tase him rather than allow medical care to be administered.

For the same reasons previously discussed, Sokoloff is not entitled to qualified immunity and any consideration of whether qualified immunity applies is premature at this stage. Sokoloff violated the Decedent's constitutional rights by actively preventing Charles County EMS from delivering medical services to the Decedent. As discussed, it was a clearly established right at the time Sokoloff tased the Decedent that individuals experiencing a medical emergency and not

actively resisting should not be tased. The Court should deny the County's request to dismiss Count 10 for asserting a violation of 42 U.S.C. § 1983.

IV.   **The Court should deny Defendant Sokoloff's request to enter summary judgment on the Plaintiff's state law claims under Article 24 and 26 of the Maryland Declaration of Rights.**

The Court should deny Sokoloff's motion for summary judgment with respect to Plaintiffs' causes of action under Articles 24 and Article 26 of the Maryland Declaration of Rights. "Where an individual is deprived of his liberty or property interests in violation of Articles 24 and 26 [of the Maryland Declaration of Rights], he may enforce those rights by bringing a common law action for damages." *Widgeon v. Eastern Shore Hosp. Center*, 300 Md. 520, 537-38 (1984). "Article 24 protects substantive due process rights, while Article 26 protects the right to be free from unreasonable searches and seizures." *Barnes v. Montgomery County*, 798 F.Supp.2d 688, 700 (D. Md. 2011). Article 24 is read *in pari materia* with the Fourteenth Amendment, and Article 26 is read *in pari material* with the Fourth Amendment. *Id.*; *Ross v. Early*, 900 F.Supp.2d 415, 431 (D. Md. 2012).

The Maryland Pattern Jury Instructions set forth the requirements for a claim of excessive force under the Maryland Declaration of Rights:

> Every person has the right not to be subjected to excessive or unreasonable force while being arrested by a police officer, even if the arrest is otherwise lawful. In making a lawful arrest, an officer has the right to use reasonably necessary force to complete the arrest.
>
> Reasonable force is that degree of force a reasonable police officer would have applied in making the arrest under the same or similar circumstances.
>
> In determining whether the force used was excessive, you should consider: the need for application of force; the relationship between the need and the amount of force that was used; the extent of the injury inflicted; and whether a reasonable officer on the scene, without the benefit of hindsight, would have used that much force under similar circumstances. You must decide whether the officer's actions were reasonable in light of the facts and circumstances confronting the officer.

MPJI-CV 28:4 Excessive Force.

Here, viewed in the light most favorable to the Plaintiffs, a reasonable juror could conclude that Sokoloff used "unreasonable force" when he tased the Decedent. In the light most favorable to Plaintiffs, at the time Sokoloff tased him, the Decedent was unarmed, did not present a threat to Sokoloff or the other EMS workers, and was suffering from a seizure. Police practices expert Stine has opined that "Deputy Sokoloff's use of force on DeOntre Dorsey where Deputy Sokoloff tasered him multiple times on March 1, 2015 was not objectively reasonable and not consistent with standard police practices, polices and training." (Ex. 2, Stine Decl., at ¶ 10). Put simply, Sokoloff's motion for summary judgment on Plaintiff's causes of action under Article 24 and Article 26 of the Maryland Declaration of Rights should be denied.

**V.      Viewed in the light most favorable to Plaintiffs, there are sufficient facts that a reasonable jury could conclude that Sokoloff acted with gross negligence and/or malice.**

"[S]tate personnel are not immune from suit and liability in tort when the plaintiff's complaint *sufficiently* alleges malice or gross negligence." *Murphy-Taylor v. Hofmann*, 968 F.Supp.2d 693, 739 (D. Md. 2013). Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.  Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985). Pursuant to the malice exception for MTCA immunity, a state official's conduct is malicious if it is "characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Barbre v. Pope*, 402 Md. 157, 182 (2007). "Actual

34

malice does not always have to be shown with specificity; it can be inferred." *Bord v. Balt. Cty.*, 220 Md. App. 529, 558 (2014).

Ordinarily, whether an individual acted with gross negligence or malice are questions of fact for a jury to decide. *See Rodriguez v. State*, 218 Md. App. 573, 598-99 (2014) ("It is usually a question for the jury and is a question of law only when reasonable men could not differ as to the rational conclusion to be reached."); *Bord*, 220 Md. App. 529, 557 (2014) ("[O]rdinarily, the presence or absence of malice is a fact to be determined at trial."). In making a determination as to malice, "courts must draw all inferences regarding credibility and factual disputes in favor of the plaintiff." *Chinwuba v. Larsen*, 142 Md. App. 327, 382 (2002).

Here, viewed in the light most favorable to the Plaintiffs, a jury could conclude that Sokoloff's actions of tasering the Decedent multiple times while the Decedent was suffering from a seizure constituted gross negligence or malice, i.e., an intent to injure or knowing and deliberate wrongdoing. This is especially true because Sokoloff has previously had a civil jury verdict entered against for excessive force using a taser and his prior sworn testimony that he believed an individual engaged in voluntary conduct when they were being tasered to apparently justify additional shocks as a pain compliance tool.

## CONCLUSION

For the reasons stated above, Plaintiffs request that Defendant Sokoloff's motion for summary judgment be denied in its entirety.

## HEARING REQUEST

Plaintiffs request a hearing on Defendant Sokoloff's Motion for Summary Judgment and this opposition.

Respectfully submitted,

By:      _____/s/_____
        Timothy F. Maloney
        Matthew M. Bryant
        Alyse L. Prawde
        JOSEPH, GREENWALD & LAAKE, P.A.
        6404 Ivy Lane, Suite 400
        Greenbelt, Maryland 20770
        301/220-2200 (tel.)
        301/220-1214 (fax)
        *Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of September, 2018, a copy of the foregoing was served on all counsel of record via the Court's ECF system.

        _____/s/_____
        Alyse L. Prawde

36