# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | | |
|---|---|---|---|
| **LIONEL S. DORSEY, ET AL.** | * | | |
| | * | | |
| Plaintiffs | * | | |
| v. | * | Civil No. | **PJM 18-829** |
| | * | | |
| **MICHAEL SOKOLOFF, ET AL.** | * | | |
| | * | | |
| Defendants | * | | |

## **MEMORANDUM OPINION**

Lionel S. Dorsey and Andrea R. Smoot, individually and as Personal Representatives of the Estate of DeOntre Dorsey; Trina Swann, as Mother and Next Friend of minor child D.S.; and Margaret Meredith, as Mother and Next Friend of minor children D.D., D.D., and D.D. (collectively Plaintiffs) sue several members of the Charles County, Maryland Sheriff's Office—Michael Sokoloff, Troy Berry, Michael McGuigan, Rex Wayne Coffey (retired)—as well as the State of Maryland and the Board of County Commissioners of Charles County, Maryland (collectively Defendants).[1] Plaintiffs allege numerous federal and state civil rights violations stemming from an incident that occurred on March 1, 2015, when DeOntre Dorsey ("Dorsey" or "the Decedent"), while having a grand mal seizure on the ground outside his vehicle on a public parkway, received several electric shocks from a Taser operated by Defendant Sokoloff, went into cardiac arrest, lapsed into a coma, and died nine months later on November 29, 2015. For the reasons that follow:

Coffey's Motions to Dismiss (ECF Nos. 71, 91) are **DENIED**. His Motions to Bifurcate (ECF Nos. 71, 91) are **GRANTED**. Specifically, Coffey's Motions to Bifurcate Counts 7 and 8

---

[1] Plaintiffs initially filed suit in the Circuit Court for Charles County, Maryland, but Defendants removed the case to this court on March 22, 2018. ECF No. 1.

1

in Plaintiffs' Second Amended Complaint are **GRANTED** and **STAYED** pending resolution of the claims against the individual officers.

Berry's Motion to Disqualify Plaintiffs' Counsel (ECF No. 80) is **DENIED**.

Sokoloff's Motion for Summary Judgment (ECF No. 88) is **DENIED**.

The State of Maryland's Motion for Summary Judgment (ECF No. 105) is **DENIED**.

I. **Factual and Procedural Background**

According to the Second Amended Complaint (ECF No. 85):

While driving on St. Charles Parkway in White Plains, Charles County, Maryland on the afternoon of March 1, 2015, Dorsey suffered a grand mal seizure that caused him to lose control of his vehicle, which came to a stop on the center median of the Parkway. ECF No. 85 ("Second Amended Complaint") at ¶¶ 47–48. A bystander placed a call to 911 and reported that Dorsey, still in his vehicle, appeared to be "'having some type of seizure[ ]'" and that he was "'jumping all over the place'" and "'shaking and moving his arms and everything.'" *Id.* at ¶ 49. When paramedics arrived shortly thereafter, Dorsey was still inside his vehicle, "flailing" and "kicking his legs uncontrollably." *Id.* at ¶ 51. Paramedics attempted to smash the windows of Dorsey's vehicle to administer treatment but eventually were able to unlock the vehicle's doors. *Id.* at ¶ 52. Dorsey then fell out of his vehicle on to the ground and continued seizing uncontrollably. *Id.* at ¶¶ 53, 55.

At that point, Corporal Sokoloff, a deputy in the Charles County Sheriff's Office, arrived on the scene. *Id.* at ¶ 56. Sokoloff ordered Dorsey to place his hands behind his back, but Dorsey did not respond to Sokoloff's instruction and continued to spasm uncontrollably. *Id.* at ¶¶ 57–59. Dorsey then appeared to regain some semblance of control, rolling on to his hands and knees and attempting to stand up. *Id.* at ¶ 60. But as Dorsey attempted to stand, Sokoloff deployed his Taser, firing a projectile electric cartridge into Dorsey. *Id.* at ¶ 62. On receiving

the initial electric shock, Dorsey fell to the ground and became entangled in the Taser wires. *Id.* at ¶ 63. Sokoloff then, he claims, unintentionally discharged a second Taser cartridge, with only one probe from the second cartridge connecting with Dorsey's body. *Id.* at ¶ 65. Sokoloff then delivered at least five more electric shocks to Dorsey's body while continuing to command him to cease flailing. *Id.* at ¶ 66.

After administering the electric shocks, Sokoloff placed Dorsey in handcuffs by sitting on him and using his legs to prevent him from standing. *Id.* at ¶ 69. Other deputies from the Charles County Sheriff's Office arrived, and one placed leg shackles on Dorsey. *Id.* at ¶ 70. At that point, paramedics on the scene noticed that Dorsey had stopped breathing and determined that he had gone into cardiac arrest. *Id.* at ¶ 71. Dorsey was taken to the hospital for further medical care, but never regained consciousness. *Id.* at ¶ 74. On November 29, 2015, while still in the hospital, Dorsey died. *Id.* at ¶ 74.

## II. Coffey's Motions to Dismiss And/Or Bifurcate

Coffey filed a Motion to Dismiss and/or to Bifurcate Plaintiffs' First Amended Complaint on July 12, 2018 (ECF No. 71), and, after Plaintiffs filed their Second Amended Complaint, Coffey refiled the Motion on August 20, 2018 (ECF No. 91). The two Motions are functionally equivalent in that they both adopt and incorporate the same arguments that the other Defendants made in their Motions to Dismiss and/or Bifurcate. *See* ECF No. 71-1 at 1 ("Defendant Coffey adopts and incorporates by reference the motions to dismiss and/or bifurcate, and supporting memoranda, filed on behalf of the Board of Charles County Commissioners (ECF 45 and 57), Michael Sokoloff (ECF 46 and 58), and Michael McGuigan and Sheriff Troy Berry (ECF 37 and 62).").

On July 16, 2018, the Court held a hearing on the Motions to Dismiss and/or Bifurcate filed by all Defendants other than Coffey but declined to hear argument on Coffey's Motion

because it was filed too close in time to the hearing date and therefore was not ripe for review. For the reasons stated on the record during the hearing, the Court denied the Motions to Dismiss of all other Defendants and granted all Motions to Bifurcate. *See* ECF Nos. 75, 87. Specifically, the Court bifurcated the federal and state unlawful pattern and practice claims in Plaintiffs' First Amended Complaint (i.e., Counts VII and VIII) and stayed them pending resolution of the claims against the individuals in the case. *See* ECF No. 75. In their Second Amended Complaint (ECF No. 85), Plaintiffs have retained the bifurcated unlawful pattern and practice claims from the First Amended Complaint, merely renumbering them as Counts 7 and 8.

Because Coffey has done no more than adopt the arguments made by the other Defendants in their Motions to Dismiss, which the Court has already denied, the Court incorporates by reference the reasons for denial it stated on the record at the hearing held on July 16, 2018, and will therefore **DENY** Coffey's Motions to Dismiss (ECF Nos. 71, 91) for the same reasons. It will **GRANT** Coffey's Motions to Bifurcate Counts 7 and 8 in Plaintiffs' Second Amended Complaint (ECF Nos. 71, 91) and stay any decision with respect to them pending resolution of the claims against the individuals in the case.

### III.  Berry's Motion to Disqualify Counsel

Sheriff Berry asks the Court to disqualify Plaintiffs' counsel Timothy Maloney, Matthew Bryant, and their law firm Joseph, Greenwood & Laake, P.A ("JGL") based on an alleged conflict of interest, detailed as follows. In 2012, Maloney, Bryant, and JGL represented Berry in an action against one of his co-Defendants in the present case, former Sheriff Coffey. In that action, Berry alleged that while he served as Commander of the Office of Professional Responsibility in the Charles County Sheriff's Office, Coffey obstructed investigations and disciplinary proceedings affecting officers who were Coffey's political allies, and in retaliation for Berry conducting those investigations, Coffey demoted Berry. Berry alleges that the present

case is substantially related to the 2012 action, and because there is a substantial risk that Plaintiffs' counsel had access to confidential information about Berry from the previous case, that could materially advance the Plaintiffs' interests vis-à-vis Berry in the present case, there is a conflict of interest that should disqualify Plaintiffs' counsel. Messrs. Maloney and Bryant and JGL sharply disagree.

Motions for disqualification of counsel are disfavored and are "permitted only where the conflict is such as clearly to call into question the fair and efficient administration of justice." *Gross v. SES Americom, Inc.*, 307 F. Supp. 2d 719, 723 (D. Md. 2004) (citing Maryland Rule 19-301.7) (internal quotation marks omitted). Accordingly, a party moving for disqualification based on an attorney's alleged conflict of interest derived from representation in a prior matter must demonstrate (1) the existence of a previous attorney-client relationship between the challenged lawyer or law firm and the objecting former client, and (2) that the matter at issue in the present representation is "the same or substantially related" to the matter at issue in the previous representation. *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 551–52 (D. Md. 2008).

"Matters are 'substantially related' . . . if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Maryland Rule 19-301.9, cmt. 3. "The focus of the substantial-relationship inquiry is 'the factual nexus between the earlier representation and the present, adverse representation.'" *Pa. Nat. Mut. Cas. Ins. Co. v. Perlberg*, 819 F. Supp. 2d 449, 455 (D. Md. 2011) (quoting *Blumenthal Power Co., Inc. v. Browning–Ferris, Inc.,* 903 F. Supp. 901, 902 (D.Md.1995)). "'Substantially related' has been interpreted to mean 'identical' or 'essentially the same,' or 'factually related.'" *Id.* (quoting *Nichols Agency, Inc. v. Enchanted Child Care, Inc.*, 537 F. Supp. 774, 779 (D. Md. 2008)).

The matter in which disqualification is sought does not need to "involve the same operative facts" as the prior matter in order to be "substantially related," but there still must be "a sufficient similarity of issue" between the two matters. *Id.* (citing *Buckley v. Airshield Corp.*, 908 F. Supp. 299, 304 (D. Md. 1995) (internal quotation marks omitted)). In determining the relationship between a current and prior matter, "[t]he court's primary concern is whether there is a reasonable probability that confidences were disclosed in the prior representation which could be used against the former client in the current litigation." *Id.* (quoting *Stratagene v. Invitrogen Corp.*, 225 F.Supp.2d 608, 611 (D. Md. 2002) (internal citation and quotation marks omitted)). "[K]nowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." Maryland Rule 19-301.9, cmt. 3.

The parties do not dispute that Plaintiffs' counsel previously had an attorney-client relationship with Berry in 2012. *See* ECF No. 93-1 at 7. Accordingly, their disqualification depends on whether the present case and the 2012 matter involving Sheriff Berry are "substantially related." Since the present case and the 2012 matter do not involve the same "transaction or legal dispute," they may still be deemed "substantially related," hence disqualifying, if there is a "sufficient similarity of issue" between the two matters and if there is a "substantial risk" that confidential information counsel obtained from Berry in the 2012 matter would "materially advance" Plaintiffs' case.

Although, as movant, Berry admits that the issues in the 2012 matter "are obviously not identical to the issues in *Dorsey v. Sokoloff*," ECF No. 80-1 at 9, i.e., the present case, he argues that the two matters are "substantially related" because they both involve questions of how internal investigations of Sheriff's deputies are conducted. Berry claims that confidential information he provided Plaintiffs' counsel in 2012 about the operations of the Office of

Professional Responsibility could be used against him and the other Defendants in the present case to demonstrate how he had allegedly failed to discipline and supervise Sokoloff. *Id.*

While it does appear that both the 2012 matter and the present case touch on issues related to Berry's supervisory role over internal investigations and discipline in the Charles County Sheriff's Office, the Court finds this factual nexus insufficient to suggest that the two matters are substantially related such that disqualification is necessary. Merely because a current and prior representation share *some* relevant facts does not suffice for disqualification; a greater degree of similarity of the underlying causes of action is necessary. *Compare Buckley v. Airshield Corp.*, 908 F. Supp. 299, 305–06 (D. Md. 1995) (granting patentee's motion to disqualify licensee's counsel in a breach of licensing agreement and patent infringement action when licensee's counsel had previously represented patentee in a prior patent infringement action), *with Shih Ping Li v. Tzu Lee*, 210 Md. App. 73, 108–10, 62 A.3d 212, 23324 (Md. Ct. Spec. App. 2013), *aff'd* 437 Md. 47, 85 A.3d 144 (2014) (holding that wife was not required to seek husband's consent to retain same counsel to represent her in divorce proceedings that husband had previously retained to obtain lawful permanent resident status for wife because "immigration petitions and . . . separation agreements involve wholly different practical areas of law and issues and, therefore, are not substantially related," even though the two representations both required counsel to review the parties' financial statements).

More to the point, "[w]here the prior matter involved an organizational client . . . 'general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation.'" *Perlberg*, 819 F. Supp. 2d at 455 (quoting Maryland Rule 19-301.9, cmt. 3). Admittedly, while Berry was not an organizational client, his argument for disqualifying Plaintiffs' counsel suggests that he may have disclosed confidential information about organizational investigative and disciplinary procedures employed by the Sheriff's Office

7

of Professional Responsibility. ECF No. 80-1 at 9. But, as indicated, such knowledge is "insufficient for disqualification" of the attorney in a subsequent representation against the former client. *See, e.g.*, *Perlberg*, 819 F. Supp. 2d at 455–56 (denying insurance company's motion to disqualify a former outside counsel, who had previously represented the company's insureds in lead-paint and automobile tort actions, when that attorney represented an insured in a duty to defend action against the insurance company, after the company refused to defend the insured against an underlying lead-paint tort suit).

To be sure, Plaintiffs' counsel have identified three documents from its 2012 representation of Berry that involved "Tasers and/or Sokoloff," two of which show that, after being demoted from Commander of the Office of Professional Responsibility at the end of 2010, Berry was one of Sokoloff's supervising officers and reviewed an instance where, in September 2012, Sokoloff had discharged his Taser and was subsequently accused of excessive force. *See* ECF Nos. 97-2, 97-3. But even if this information is presumed to be confidential based on the former attorney-client relationship between Berry and Plaintiffs' counsel in 2012, Berry must still demonstrate that "the confidential information which is assumed to have been shared in the previous representation could be used to the detriment of the former client in the current proceeding." *Nichols Agency*, 537 F. Supp. 2d at 779–80. He has not done so.

Berry's liability in this case, if any, must be predicated on his liability in a supervisory capacity. To establish a claim of supervisory liability against Berry, Plaintiffs would have to show (1) that Berry had actual or constructive knowledge that Sokoloff was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like Dorsey; (2) that Berry's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between Berry's inaction and the particular constitutional injury

suffered by Dorsey. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). The documents from the 2012 representation state only that Sokoloff discharged his Taser after a confrontation with a suspect and that Berry requested that the Office of Professional Responsibility review the incident. ECF Nos. 97-2, 97-3. One document also includes a handwritten note from an unknown author requesting Berry's signature on the incident report involving Sokoloff, as well as authorizing Berry to investigate further "if need be." ECF No. 97-3. While these documents demonstrate that Berry had supervisory responsibilities over Sokoloff and was aware that Sokoloff had previously discharged a Taser in the course of his responsibilities as a deputy, they do not in any sense show that Sokoloff's Taser use constituted a "pervasive and unreasonable risk" of constitutional injury, let alone that Berry was deliberately indifferent to any allegedly unconstitutional practices. In sum, the Court finds no "substantial risk" that the presumed confidential information contained in these documents from the 2012 representation would "materially advance" Plaintiffs' claims against Berry or the other Defendants in the present suit. *See* Maryland Rule 19-301.9, cmt. 3.

Since the 2012 matter and present case are not substantially related, and there is no substantial risk that previously-obtained confidential information would materially advance Plaintiffs' claims, Berry's Motion to Disqualify Counsel will be **DENIED**.

## IV. Sokoloff's Motion for Summary Judgment

Sokoloff argues that he is entitled to Summary Judgment on the issue of qualified immunity. The Court disagrees.

### A.

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This does not mean, however, that "*some* alleged factual

dispute between the parties" necessarily defeats the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original).

In reviewing a motion for summary judgment, the court views the facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). The court must also "refrain from 'weigh[ing] the evidence or mak[ing] credibility determinations'" when evaluating motions for summary judgment. *Lee*, 863 F.3d at 327 (quoting *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)). Accordingly, in reviewing a motion for summary judgment on the basis of qualified immunity, the court generally adopts "the plaintiff's version of the facts." *Witt v. W. Va. State Police, Troop 2*, 633 F. 3d 272, 276 (4th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

**B.**

Courts apply a two-step test in determining whether a police officer is entitled to qualified immunity, inquiring, first, "whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the officer's conduct violated the plaintiff's constitutional right," and, second, if the first prong is satisfied, "whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 219 (4th Cir. 2018) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). However, the Fourth Circuit analyzes claims of qualified immunity by first examining whether the plaintiff has alleged the deprivation

of a constitutional right, which the Fourth Circuit recognizes as the more "beneficial" approach. *Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 898–99 (4th Cir. 2016) (citing *Pearson*, 555 U.S. at 232, 236) (internal quotation marks omitted).

**1.**

A claim that a police officer used excessive force in making an arrest, investigatory stop, or seizure of a person is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Armstrong*, 810 F.3d at 899 (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). Courts examine three factors to determine if an officer's use of force was objectively reasonable: (1) the severity of the crime at issue, (2) the extent to which a suspect "poses an immediate threat to the safety of the officers or others," and (3) the extent to which a suspect "is actively resisting arrest or attempting to evade arrest by flight." *See Wilson*, 893 F.3d at 219–20 (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted).

Viewing the facts of Sokoloff's Taser use in the light most favorable to Dorsey, it is apparent that Sokoloff used excessive force and violated Dorsey's Fourth Amendment rights.

The first *Graham* factor clearly weighs in Dorsey's favor. He was committing no crime at the time Sokoloff used his Taser to restrain him, he had merely suffered an involuntary seizure while driving. His vehicle was not blocking traffic, and he was writhing on the ground. "When the subject of a seizure 'ha[s] not committed any crime, this factor weighs heavily in [the subject's] favor.'" *Armstrong*, 810 F.3d at 899 (quoting *Bailey v. Kennedy,* 349 F.3d 731, 743–44 (4th Cir. 2003)).

While the second *Graham* factor is a closer call, the Court finds that it also favors Dorsey or, at the very least, that a jury could reasonably so conclude. While on his way to respond to the erratic driving incident involving Dorsey, Sokoloff alleges that the Sheriff's Office dispatcher informed him that emergency medical services personnel had found a loaded firearm inside

11

Dorsey's vehicle. ECF No. 88-11 ("Sokoloff Affidavit") at ¶¶ 4–5. But before Sokoloff arrived at the scene, the dispatcher also informed him that the weapon had been secured, which emergency personnel confirmed to Sokoloff upon his arrival. *Id.* at ¶ 5. Sokoloff alleges that emergency personnel told him that they did not know if there were other weapons in Dorsey's car, *Id.*, but, regardless, once on the scene, Sokoloff did not search the vehicle for additional firearms. Indeed, there is no indication that any one remained in Dorsey's vehicle. As Sokoloff moved closer to Dorsey, Dorsey did reach out while spasming and grab the legs of a firefighter who was on the scene. *Id.* at ¶ 7; ECF No. 88-8 ("Tyrell Affidavit") at ¶ 5. But before Sokoloff reached Dorsey's position, the firefighter was able to free himself from Dorsey's grip. Sokoloff Affidavit at ¶ 7; Tyrell Affidavit at ¶ 5. Sokoloff stated that "[b]ased on what [he] had just seen and been told, including the uncertainty about other weapons," he concluded that Dorsey represented enough of a safety threat to require detention. Sokoloff Affidavit at ¶ 8.

At that point, however, it cannot be said that Dorsey posed an immediate threat to Sokoloff or others. While emergency personnel had found a firearm in Dorsey's car, they told Sokoloff they had secured the weapon in an ambulance, beyond Dorsey's immediate reach. Sokoloff Affidavit at ¶ 5. And while Dorsey had grabbed a firefighter, that firefighter had managed to free himself before the full volley of Tasers began. There is no indication that Dorsey was in contact with any other emergency personnel or sheriff's deputies at the time Sokoloff deployed his Taser. To be sure, the fact that one weapon may have been found in Dorsey's car, although secured by law enforcement personnel, might suggest the possibility that a second was available to him. Yet, with Dorsey writhing on the ground, the failure to attempt to verify whether there was a second weapon makes the multiple Taser shocks more problematic. For a threat to the safety of others to be immediate, greater certainty of the potential for the subject of a seizure to cause harm is required, since "[f]orce is reasonable only when exercised in

12

proportion to the threat posed." *See, e.g.*, *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (holding that the unverified possibility that a suspect had placed a weapon nearby was insufficient to rise to the level of an immediate threat justifying an officer's use of a Taser, when the suspect was unarmed, lying face down on the ground with his hands underneath him, and had already been Tased twice). Here, a jury could reasonably conclude that any threat posed by Dorsey was not immediate. The Court recognizes that it should not "undercut the necessary element of judgment inherent in a constable's attempts to control a volatile chain of events." *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002). But while Dorsey may have posed enough of a threat to justify arresting him after finding a loaded firearm in his car, subsequent "[p]ainful, injurious, serious inflictions of force, like the use of a Taser, do not become reasonable simply because officers have authorization to arrest a subject who is unrestrained." *Armstrong*, 810 F.3d at 904.

Sokoloff claims that, as he approached Dorsey, he called out to paramedics on the scene "to ask what the problem with the driver was," and that the paramedics responded that "they weren't sure because they hadn't been able to examine [Dorsey]." Sokoloff Affidavit at ¶ 6. Even so, the Charles County Sheriff's Office incident reports reference statements given by the paramedic in charge at the scene, who stated that "he believed Dorsey was still having a seizure" before Sokoloff deployed his Taser, and by another paramedic who stated that he arrived on the scene as part of "an EMS crew who responded to St. Charles Parkway for the person in a vehicle having a seizure." ECF No. 88-9 at 12, 15. Since some emergency personnel clearly stated their belief that Dorsey was having a medical event before and after Sokoloff arrived on the scene, Sokoloff's assertion that paramedics were uncertain as to what was causing Dorsey's condition is at best questionable.

But even if the paramedics at the scene did not inform Sokoloff that there was a possibility Dorsey was suffering from a seizure, and even if Sokoloff suspected that Dorsey was suffering from a drug overdose that might have increased the likelihood he would threaten emergency personnel or resist arrest, Sokoloff is not entitled to qualified immunity. A jury could reasonably conclude that Sokoloff's failure to inquire further as to the opinions as to of the emergency personnel about Dorsey's medical condition before deploying his Taser constituted an unreasonable and excessive use of force. *See Casey v. City of Federal Heights*, 509 F.3d 1278, 1285–86 (10th Cir. 2007) (holding that officer who had fired a Taser at a suspect "almost immediately upon arrival" at the scene of an incident, such that "she could not have known what was going on" was not entitled to qualified immunity because a jury could have reasonably determined her use of force to be excessive).

Applying the third *Graham* factor to the qualified immunity analysis also permits the conclusion that Sokoloff's use of force was excessive. As a result of his seizure, Dorsey could not actively resist or attempt to evade arrest because, it would be hard to miss, he had lost voluntary control of his body movements. Again, emergency personnel at the scene described Dorsey as writhing and flailing uncontrollably, as well as struggling to stand. *See* Sokoloff Affidavit at ¶ 5; ECF No. 88-6 ("Quinn Affidavit") at ¶¶ 7–8, ECF No. 88-7 ("Williams Affidavit") at ¶ 7. If Dorsey was unable even to stand while enduring a seizure, a jury could reasonably infer that he was not physically able to intentionally resist arrest at the time; nor would he be in a position to "evade arrest by flight." *Graham*, 490 U.S. at 396.

In sum, a jury could fairly conclude that Sokoloff's Taser use constituted excessive force.

## 2.

The second prong of the qualified immunity analysis examines whether a police officer's conduct violated a constitutional right that was clearly established at the time that the conduct

14

occurred. *See Pearson*, 555 U.S. at 232. "A right is 'clearly established' if it would be clear to a reasonable officer that the alleged conduct is unlawful." *See Wilson* 893 F.3d at 221 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine whether a right is clearly established, we assess whether the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'" *Id.* (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)). Although a court need not have recognized a right in a specific factual context before the right may be considered "clearly established," *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), courts are "not to define clearly established law at a high level of generality," and "[s]pecificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (quoting *City and Cty. of San Francisco v. Sheehan*, 135 S.Ct., 1765, 1775–76 (2015)) (internal quotation marks omitted).

At the time of Sokoloff's conduct, March 1, 2015, the most analogous case from the Fourth Circuit was that of *Meyers v. Baltimore County, Maryland*. 713 F.3d 723 (4th Cir. 2013). In *Meyers*, Baltimore County police officers responded to an emergency call at a residence where two brothers were engaged in a physical altercation. 713 F.3d at 727. When the officers arrived, one of the brothers and their father were outside, the father had sustained a laceration on his nose, and the officers could see the other brother, who was forty years old, who was living with his parents, and who had been diagnosed with bipolar disorder, was inside the home holding a baseball bat. *Id.* The officers entered the home and, after the suspect did not comply with commands to drop the bat, instead taking a step toward the officers while holding it, one of the officers deployed a Taser against him in "probe mode." *Id.* at 728. After two probes attached to the Taser were fired and struck the suspect, the officer began issuing electrical shocks. *Id.* After the officer delivered two shocks, the suspect dropped the baseball bat, and after a third shock,

15

fell to the ground. *Id.* Three officers sat on the suspect to prevent him from standing up again, but the officer who had initially deployed the Taser delivered one more shock to the suspect in "probe mode," then switched to "stun mode" and delivered six additional shocks to the suspect in the span of slightly more than one minute. *Id.* At that point, the officers noticed that the suspect appeared to be unconscious. *Id.* at 729. The suspect had gone into cardiac arrest, and paramedics were unable to revive him. *Id.*

The Fourth Circuit held that the first three Taser shocks did not constitute unreasonable and excessive force because they occurred when the suspect appeared to pose an immediate threat to the officers' safety and was actively resisting arrest. *Id.* at 733. However, the court held that the seven subsequent shocks *were* excessive and unreasonable because they occurred when the suspect no longer posed a threat nor was he resisting arrest, since he was unarmed and restrained by several officers at the time of the additional shocks. *Id.* at 733–34. In consequence, the Fourth Circuit held that the officer was not entitled to qualified immunity for seven of the Taser shocks because he had violated the clearly established constitutional right of an arrestee to be free from "'unnecessary, gratuitous, and disproportionate force'" in the seizure of a "'secured, unarmed citizen.'" *Id.* at 735 (quoting *Bailey v. Kennedy*, 349 F.3d 731, 744–45 (4th Cir. 2003)). Regardless of whether the allegedly excessive force emanates from "a gun, a baton, a Taser, or other weapon," said the court, an officer is not entitled to qualified immunity after using unreasonable force on a suspect who is "unarmed and secured." *See id.* at 734–35; *see also Park v. Shiflett*, 250 F.3d 843, 852–53 (4th Cir. 2001) (concluding that an officer's use of pepper spray to subdue an unarmed suspect was unreasonable and excessive).

On March 1, 2015, Sokoloff deployed his Taser against Dorsey twice in "probe mode," although only one deployment in this mode resulted in cartridges connecting with Dorsey's body and delivered a first electrical shock. ECF No. 88-13 at 11–12. But Sokoloff then administered

16

five additional shocks to Dorsey through the Taser's "ARC Switch," which delivers an electrical shock through probes that have already connected with a suspect's body. *Id.* at 7–8, 11–12. *Overall, Sokoloff delivered* six *electrical shocks to Dorsey in roughly 70 seconds*. *Id.* at 12.

At the time Sokoloff delivered the electrical shocks, Dorsey was no longer grabbing on to any emergency services personnel at the scene, nor was he holding a weapon or advancing on officers, as was the suspect in *Meyers*. Moreover, the fact that Dorsey continued to writhe on the ground after receiving six electrical shocks strongly suggests that he did not pose an immediate threat nor was he intentionally resisting arrest such that a Taser was necessary to subdue him. Based on the Fourth Circuit's precedent in *Meyers*, in administering six Taser shocks to Dorsey, Sokoloff violated Dorsey's clearly established constitutional right to be free from "unnecessary, gratuitous, and disproportionate force" while unarmed and secured.

Sokoloff is not entitled to qualified immunity, and the Court will **DENY** his Motion for Summary Judgment.

V.  **State of Maryland's Motion for Summary Judgment**

The State of Maryland bases its Motion for Summary Judgment on the same argument it made in its Motion to Dismiss (ECF No. 39); namely, that the State is not a proper defendant in this case because Sokoloff was not acting as a state employee at the time he used his Taser on Dorsey. ECF No. 105-1 at 1–2. In denying the State's Motion to Dismiss, the Court noted that "there is some issue of the duality of the agency of Defendant Sokoloff," and the question of whether he was working as an agent of the State or of Charles County at the time he deployed his Taser on Dorsey should be "the subject of a fact inquiry." ECF No. 87 at 39:15–19.

Maryland has established that tort judgments against a county sheriff or a deputy sheriff may be payable by either the State or the relevant County, depending on whether the sheriff or deputy sheriff was acting as a state or county employee at the time of the allegedly tortious

17

conduct.  *See* Md. Code Ann., State Fin. & Proc. § 9-108; *see also Dotson v. Chester*, 937 F.3d 920, 928 (4th Cir. 1991) ("Thus, the Sheriff is not always a state employee or always a county employee. He may, on occasion, be both, or sometimes one and sometimes the other. It all depends on the particular function the Sheriff is performing.").  For the purposes of determining whether the state or county is liable for any tort judgment, sheriffs' deputies act as state employees when they are engaged in:

> (1) courthouse security;
> (2) service of process;
> (3) the transportation of inmates to and from court proceedings;
> (4) personnel and other administrative activities;
> (5) activities, including activities relating to performing law enforcement functions, arising under a multijurisdictional agreement under the supervision and direction of the Maryland State Police or other State agency; or
> (6) any other activities, except activities relating to performing law enforcement functions or detention center functions.
>
> Md. Code Ann., State Fin. & Proc. § 9-108(a).

The State contends that Sokoloff was performing local law enforcement operations at the time he deployed his Taser against Dorsey, pointing out that Sokoloff himself declared that he had been "assigned to patrol" and was "working the evening shift" on March 1, 2015 when he "saw the call for service" from the "CCSO dispatcher" that "EMS was requesting CCSO units to respond to assist at the scene of a single vehicle accident." ECF No. 105-1 at 2–3 (citing ECF No. 88-11 ("Sokoloff Affidavit") at ¶¶ 2–3).  The State also argues that the incident reports prepared by the Charles County Sheriff's Office show that Sokoloff and the other deputies who arrived on the scene of Dorsey's car accident were "responding to 911 calls and a request from EMS for law enforcement assistance." *Id.* at 3 (citing ECF No. 88-9).  Accordingly, the State argues that there is no genuine factual dispute that Sokoloff was acting as a county employee, thereby relieving the State of liability for his actions in tort. *See id.*

While the State has unquestionably cited evidence suggesting that Sokoloff may have been performing a local law enforcement function at the time of the events in question, the Court is not persuaded at this juncture that this evidence disposes of the issue of whether there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The question of whether deputy sheriffs are state or county employees invariably tends to be an open question, one for the trier of fact to resolve. *See Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 727 (D. Md. 2013) ("The degree of control exercised by the County over employees of the Sheriff's Department is a factual issue that is not fully described by the applicable statutes and ordinances."). Even if a sheriff's deputy is performing a function described in Section 9-108 as an activity for which the County assumes financial responsibility, the State may still ultimately be liable. *See, e.g.*, *State v. Card*, 104 Md. App. 439, 440, 656 A.2d 400, 401 (Md. Ct. Spec. App. 1995) (affirming Circuit Court holding that sheriff was acting as a state official when operating the Charles County Detention Center but finding, pursuant to the enactment of § 9-108, that the State had "waived its sovereign immunity with respect to tortious conduct by sheriffs and their deputies").

The Court will **DENY** the State's Motion for Summary Judgment.

**VI. Conclusion**

For the foregoing reasons, the Court rules as follows:

Coffey's Motions to Dismiss (ECF Nos. 71, 91) are **DENIED**. His Motions to Bifurcate (ECF Nos. 71, 91) are **GRANTED**. Specifically, Coffey's Motions to Bifurcate Counts 7 and 8 in Plaintiffs' Second Amended Complaint are **GRANTED** and **STAYED** pending resolution of the claims against the individual officers.

Berry's Motion to Disqualify Plaintiffs' Counsel (ECF No. 80) is **DENIED**.

Sokoloff's Motion for Summary Judgment (ECF No. 88) is **DENIED**.

The State of Maryland's Motion for Summary Judgment (ECF No. 105) is **DENIED**.

A separate Order will **ISSUE**.

**May 17, 2019**

                                                                          /s/
                                      **PETER J. MESSITTE**
                            **UNITED STATES DISTRICT JUDGE**